UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUSTAFA AFARI,<br><br>                                                         Plaintiff,<br><br>         -against-<br><br>CHRISTOPHER PIPER, AARON BOUDREZ, TODD BAXTER, COUNTY OF MONROE, and "RICHARD ROE" SHERIFF'S DEPUTIES 1-10 and other unidentified members of the Monroe County Sheriff's Office,<br><br>                                                       Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No.: _____-cv-_____** |

Plaintiff MUSTAFA AFARI, by his attorneys, ROTH & ROTH, LLP, complaining of the Defendants, respectfully alleges, upon knowledge as to himself and otherwise upon information and belief, as follows:

## I.    PRELIMINARY STATEMENT

1.    This is a civil rights action brought against the County of Monroe and members of the Monroe County Sheriff's Office ("MCSO") to vindicate Plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. §§ 1983 and 1988, and under the laws of the State of New York. Plaintiff seeks compensatory damages, punitive damages, and attorney's fees.

2.    On July 16, 2025, at approximately 9:00 p.m., MCSO Deputy Christopher Piper stopped Plaintiff Mustafa Afari, then 21 years old, at the conclusion of a vehicle pursuit on Route 390 in the Town of Henrietta, after Mr. Afari's motorcycle broke down. This action does not challenge the stop or Mr. Afari's arrest. It challenges the gratuitous beating that Piper inflicted on Mr. Afari after Piper tackled Mr. Alfari off his motorcycle, and he was on the ground and under the deputies' control.

1

3.      After tackling Mr. Afari from his slow-moving, mechanically disabled motorcycle, without cause or justification, Piper punched Mr. Afari in the head while he lay on his back, striking the full-face motorcycle helmet Mr. Afari was wearing. When the helmet protected Mr. Afari from those punches, Piper ripped the helmet off his head and repeatedly punched Mr. Afari in the face, who was complaint and defenseless, while Piper and Deputy Boudrez restrained him on the ground. Then, after beating Mr. Afari bloody—and while Mr. Afari remained pinned beneath the two deputies—Piper discharged pepper spray directly into his face.

4.      At no time did Mr. Afari strike, attempt to strike, threaten, physically resist, or commit any other act that would justify the gross use of force used against him by Piper and Boudrez.

5.      Photographs taken at Strong Memorial Hospital, where Mr. Afari was transported by ambulance after the assault, depict his injuries:

 

6.      Piper's violence was predictable. By July 16, 2025, the County and Sheriff Todd Baxter knew, *inter alia*, that: (a) in June 2022, a Monroe County Court judge had declined to credit

2

Piper's sworn testimony and suppressed evidence on that basis in *People v. Ricky W. Simon*, CR No. 21-009598, resulting in Giglio disclosures concerning Piper by the Monroe County District Attorney's Office; and (b) on March 13, 2023, Piper assaulted Steven Kuriatnyk, inflicting injuries that included a SLAP lesion and ruptured bicep in his right shoulder requiring arthroscopic surgery and the amputation of Mr. Kuriatnyk's right big toe, which is the subject of *Kuriatnyk v. Piper*, No. 24-CV-6196 (W.D.N.Y.). Upon information and belief, Piper was never disciplined in any way for either incident.

7.    Piper's impunity is not an aberration; it is a product of how the County and Sheriff Baxter operate the MCSO. When MCSO Deputy Brett Kirkpatrick was video-recorded punching a restrained, disabled, 140-pound jail inmate in the face four times, fracturing bones in his face—force that Kirkpatrick's supervisor, the MCSO's Internal Affairs unit, and the County itself all admitted was unreasonable and unnecessary—Sheriff Baxter imposed only a 20-day suspension and remedial training. *See Dzionara-Norsen v. County of Monroe*, No. 21-CV-6715, 2025 WL 1826383 (W.D.N.Y. July 2, 2025) (granting plaintiff partial summary judgment against Kirkpatrick on excessive force and assault and battery claims). When MCSO deputies punched, kicked, and knelt on Nicholas Hinchman in June 2022—hospitalizing him for approximately three days with multiple broken ribs and a collapsed lung—the County and Baxter disciplined none of the three deputies involved. *See Hinchman v. Jolly*, No. 23-cv-6514 (W.D.N.Y.). And when MCSO Deputy Nicholas Priolo—one of the deputies who beat Mr. Hinchman—released his K-9 on a subdued motorist without warning and ordered the dog to continue mauling him for approximately three minutes, biting off most of his right ear, while Priolo punched and kicked him, the County and Baxter again imposed no discipline whatsoever. *See Megens-Sedor v. Priolo*, No. 24-CV-474 (W.D.N.Y.).

8. Evidently, the County's and Sheriff Baxter's deliberate indifference to their deputies' brutality—their consistent refusal to meaningfully investigate, discipline, or supervise deputies who use grossly excessive force—emboldened Piper to beat a compliant, helmeted 21-year-old at the end of a routine traffic stop, and then to pepper-spray him while he lay bleeding and restrained. This action seeks to hold Piper, Boudrez, Sergeant Edwards, Sheriff Baxter, and the County of Monroe accountable.

## II. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

9. This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising under the United States Constitution and 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

11. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district in which the claims arose and in which the Defendants reside and conduct business.

12. Plaintiff has complied with all conditions precedent to the commencement of this action.

13. On or about October 6, 2025, within ninety days of the accrual of his claims, Plaintiff served a Notice of Claim upon the County of Monroe, in compliance with General Municipal Law § 50-e.

14. More than thirty days have elapsed since the service of the Notice of Claim, and the County has neglected or refused to make an adjustment or payment of the claim.

4

15. This action is commenced within one year and ninety days of the events giving rise to Plaintiff's state-law causes of action, in compliance with General Municipal Law § 50-i.

16. This action falls within one or more of the exceptions set forth in CPLR § 1602, as it involves intentional acts and acts undertaken with reckless disregard for the safety of others.

### III.    THE PARTIES

17. Plaintiff MUSTAFA AFARI is a citizen of the United States and a resident of the Town of Henrietta, County of Monroe, State of New York. He was 21 years old at the time of the events described herein.

18. Defendant CHRISTOPHER PIPER ("Piper"), IBM #4719, was, at all times relevant to this Complaint, a Deputy Sheriff with the MCSO assigned to road patrol in Zone B. Before joining the MCSO, Piper was a police officer with the East Rochester Police Department. At all relevant times, Piper was acting within the scope of his employment with the County and under color of state law. He is sued in his individual capacity.

19. Defendant AARON BOUDREZ ("Boudrez"), IBM #4752, was, at all times relevant to this Complaint, a Deputy Sheriff with the MCSO. At all relevant times, Boudrez was acting within the scope of his employment with the County and under color of state law. He is sued in his individual capacity.

20. Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. Baxter is responsible for the hiring, training, supervision, and discipline of MCSO members under state law, and he is the County's final policymaker with respect to the supervision and discipline of MCSO members and the MCSO's use-of-force policies and practices. At all relevant times, Baxter was acting within

5

the scope of his employment and under color of state law. He is sued in his individual and official capacities.

21. Defendant COUNTY OF MONROE (the "County") is a municipal corporation organized and existing under the laws of the State of New York. The MCSO is the County's law-enforcement agency. The County is sued pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

22. Defendants "RICHARD ROE" SHERIFF'S DEPUTIES 1-10 (the names and numbers of whom are currently unknown) were, at all times relevant to this Complaint, members of the MCSO who were present at the scene and participated in, observed, and/or failed to intervene in the misconduct alleged herein. At all relevant times, they were acting within the scope of their employment with the County and under color of state law. They are sued in their individual capacities. Piper, Boudrez, and the Roe deputies are referred to collectively as "the Sheriff's Deputies."

## IV.   FACTUAL ALLEGATIONS

### A. The Stop of Mr. Afari

23. On July 16, 2025, at approximately 9:00 p.m., Mr. Afari was riding a 2008 Yamaha R6 motorcycle in the Town of Henrietta, County of Monroe. He was wearing a full-face motorcycle helmet.

24. Piper, who was on patrol in the area of Hylan Drive, attempted to stop Mr. Afari for alleged traffic violations. Mr. Afari did not initially stop and continued onto Route 390 southbound.

25. On Route 390, Mr. Afari's motorcycle suffered a mechanical failure and lost power. By the time the motorcycle approached the Rush Henrietta Town Line Road overpass, it was disabled and traveling at approximately 10 to 15 miles per hour.

26. Multiple MCSO patrol vehicles had converged around Mr. Afari, and the surrounding traffic had slowed to a near standstill. Mr. Afari was surrounded, on a dying motorcycle, with nowhere to go.

27. By his own account, Piper "made the decision to quickly exit [his] vehicle, run towards the driver," and take Mr. Afari into custody using what he later described in MCSO paperwork as "subject management techniques."

28. Piper ran at Mr. Afari and tackled him off the slow-moving motorcycle and onto the pavement.

29. Once he was knocked to the ground, Mr. Afari immediately gave up any thought of flight, ceased any noncompliance, and submitted to the deputies. He did not strike, kick, push, or threaten anyone, did not attempt to flee; and did not resist arrest in any way.

### B. Piper's Beating and Pepper-Spraying of the Restrained Mr. Afari

30. As Mr. Afari lay on his back on the pavement, Piper's first response was to punch at Mr. Afari's head, striking the full-face motorcycle helmet that Mr. Afari was wearing.

31. The helmet protected Mr. Afari's head and face from Piper's initial punches.

32. Because the helmet was protecting Mr. Afari from the blows, Piper and/or Boudrez ripped the helmet off Mr. Afari's head and threw it away from him.

33. Piper then repeatedly punched Mr. Afari in the face—striking his eyes, nose, and mouth—while Mr. Afari was pinned to the ground and restrained by both Piper and Boudrez.

34. Mr. Afari never punched, kicked, bit, grabbed, or threatened Piper, Boudrez, or any other deputy. He posed no threat to anyone. He was a 21-year-old pinned beneath two armed deputies, with additional members on scene.

35. Piper's punches caused blood to gush from Mr. Afari's nose. Blood ran down his face and into his throat, choking him and making it difficult to breathe.

36. The deputies ordered Mr. Afari to roll onto his stomach, and he complied. One or more of the deputies then pressed a knee into Mr. Afari's neck. Mr. Afari pleaded that he could not breathe because of the blood choking him. Upon information and belief, Piper continued to strike Mr. Afari even after he was lying face-down.

37. The deputies yelled at Mr. Afari to put his hands behind his back. Mr. Afari tried to comply, but one of his arms was pinned beneath the deputies' weight, and the deputies' own force prevented him from moving his arms as ordered.

38. Then, while Mr. Afari was held face-down on the ground by both Piper and Boudrez—bleeding heavily, struggling to breathe, and not resisting—Piper discharged OC ("pepper") spray directly into Mr. Afari's face.

39. Piper pepper-sprayed Mr. Afari after he had already repeatedly punched him in the face, and while Mr. Afari was fully restrained by two deputies.

40. Under MCSO defensive-tactics training and policy, closed-fist strikes to a subject's face or head are classified among the highest levels of force, and OC spray may not be used on a restrained, non-resisting subject and Mr. Afari was a restrained and non-resisting subject.

41. The deputies handcuffed Mr. Afari and dragged him to a patrol car. He could not see because of the pepper spray and the blood and swelling around his eyes, and he was hyperventilating.

C. **Piper's Continued Aggression, the Deputies' Celebration, and the Threat to Pepper-Spray Mr. Afari a Second Time**

42. Locked in the back of the patrol car—blinded, bleeding, coughing, and burning from the OC spray—Mr. Afari begged for water and for air.

43. Deputies briefly lowered a window for Mr. Afari, then rolled it back up.

44. Piper remained so aggressive toward the restrained, visibly injured Mr. Afari that another member directed Piper to step away from the patrol car.

45. When Mr. Afari knocked on the window to ask for air and water, Piper threatened him that if he knocked one more time, Piper would pepper-spray him again.

46. Piper's threat placed Mr. Afari—already beaten, blinded, and struggling to breathe—in fear of further imminent harm.

47. One member offered to give Mr. Afari water, but another member refused and stated, in sum and substance, that Mr. Afari should suffer until the ambulance arrived. No deputy provided Mr. Afari any first aid despite his visible injuries and bleeding face.

48. Sergeant Edwards and Lieutenant Beh responded to the scene. Sergeant Edwards personally observed Mr. Afari's obvious and serious injuries, and personally observed Piper's continued aggression toward the restrained and injured Mr. Afari, including, upon information and belief, Piper's threat to pepper-spray him a second time.

49. An MCSO Technical Services Unit technician responded to the scene and photographed, among other things, "closeup pictures of [Mr. Afari's] face" and his hands in handcuffs—documentation of the injuries the deputies had just inflicted.

50. Mr. Afari's helmet was thrown into the tall grass off the roadway, and his eyeglasses were left on the ground at the scene, where his family recovered them days later.

9

51. An ambulance ultimately responded and transported Mr. Afari to Strong Memorial Hospital for treatment. As the MCSO's own arrest paperwork records, Mr. Afari had to be "[i]ssued a fingerprint slip due to being hospitalized."

52. Piper issued Mr. Afari an appearance ticket and numerous traffic tickets returnable in Henrietta Town Court on August 12, 2025.

### D.  Mr. Afari's Injuries

53. As a result of the Defendants' conduct, Mr. Afari suffered serious physical injuries, including: severe trauma to his face and head; both eyes blackened; his left eye swollen completely shut with severe periorbital swelling and hematoma; subconjunctival hemorrhage; profuse bleeding from his nose; a cut and swollen lip; abrasions, lacerations, and contusions to his face, head, shoulders, arms, and body; and chemical burns and injuries from the OC spray.

54. Before July 16, 2025, Mr. Afari had never had a black eye or any comparable injury to his face.

55. Mr. Afari also suffered, and continues to suffer, serious emotional and psychological injuries as a result of being beaten, pepper-sprayed, mocked, and threatened while restrained, including fear, anxiety, humiliation, and emotional distress.

56. Mr. Afari also sustained economic damages, including medical expenses and other out-of-pocket losses.

### E.  Piper's Known History of Dishonesty and Excessive Force—and the County's and Baxter's Failure to Discipline Him

57. On June 22, 2022, Monroe County Court Judge Douglas A. Randall issued an oral decision in *People v. Ricky W. Simon*, CR No. 21-009598, in which the Court, based on the totality

of the evidence, declined to credit the testimony of Deputy Christopher Piper and granted the defendant's motion to suppress evidence.

58. As a result of that adverse credibility finding, the Monroe County District Attorney's Office has issued Giglio disclosure letters concerning Piper to criminal defendants in cases in which Piper is a witness.

59. Upon information and belief, neither the County, nor the MCSO, nor Baxter imposed any discipline, retraining, or corrective action on Piper as a result of the Court's finding that his sworn testimony was not credible.

60. On March 13, 2023, Piper, along with Deputies David Blaho and Samantha Simonetti, responded to the home of Steven Kuriatnyk at 970 Rush Scottsville Road in the Town of Rush (MCSO CR No. 23-041165). After the deputies determined that it was a domestic incident that had to be handled in Family Court, and they were leaving the home, Piper decided to initiate a physical altercation with Mr. Kuriatnyk. As Piper was walking down the driveway, he turned around, went back up the steps to Mr. Kuriatnyk's front porch, and without justification, violently shoved Mr. Kuriatnyk in the chest with both hands, throwing him across his porch and into a glass table, which shattered. As Mr. Kuriatnyk attempted to stand, Piper tackled him to the ground and slammed his body into the ground, struck him with a closed fist, and delivered knee strikes to his ribcage. Piper struck Mr. Kuriatnyk while he was on the ground and controlled by three deputies and gratuitously wrenched his arms up behind his back while he was being handcuffed, hyperextending his shoulders.

61. As a result of the force Piper used against him, Mr. Kuriatnyk suffered serious injuries, including a fractured rib; a shard of glass embedded in his right big toe, which ultimately required

amputation of the toe; and a SLAP lesion in his right shoulder and a ruptured right biceps, which required arthroscopic surgery. He required hospital treatment for his injuries.

62. Mr. Kuriatnyk was falsely charged with resisting arrest, assault in the second degree, and criminal obstruction of breathing. During his prosecution, the MCSO withheld Piper's body-worn-camera recording for approximately six months; when it was finally disclosed, the recording contradicted Piper's account, and all charges against Mr. Kuriatnyk were promptly dismissed, on October 27, 2023. Mr. Kuriatnyk's civil rights action, *Kuriatnyk v. Piper*, No. 24-CV-6196 (W.D.N.Y.), in which Baxter is also a defendant, remains pending.

63. Upon information and belief, neither the County, nor the MCSO, nor Baxter imposed any discipline, suspension, retraining, or heightened supervision on Piper in connection with the Kuriatnyk incident.

64. Baxter has had actual notice of Piper's assault on Mr. Kuriatnyk since at least March 2024, when Baxter was personally served as a defendant in Mr. Kuriatnyk's lawsuit. Upon information and belief, Baxter took no action of any kind in response.

65. Thus, by July 16, 2025, Piper had been found incredible by a county court judge and had inflicted injuries on a homeowner that required surgery and an amputation—all without a single day of discipline, retraining, or restriction. The County and Baxter kept Piper on full, unrestricted patrol duty.

66. The message the County and Baxter sent Piper—and every MCSO deputy—was unmistakable: deputies can lie, beat, and maim without consequence.

## F. The County's Pattern and Practice of Tolerating Deputies' Excessive Force

67. Piper's history is part of a broader, well-documented pattern: when MCSO deputies use grossly excessive force—even force that the County itself concedes was unjustified, and even

force that hospitalizes its victims—the County and Baxter either impose no discipline at all or impose discipline so grossly inadequate that it communicates tolerance, not deterrence.

68. The *Dzionara-Norsen* incident: On November 25, 2020, at the Monroe County Jail, MCSO Deputy Brett Kirkpatrick ran up to Richard Dzionara-Norsen—a 5'9″, approximately 140-pound, disabled man who was already restrained against a wall by a much larger deputy—and punched him in the face four times, fracturing bones in his face. The entire incident was captured on the Jail's security video. Mr. Dzionara-Norsen was treated at Strong Memorial Hospital for facial fractures.

69. Kirkpatrick's own supervisor reviewed the video and immediately determined that Kirkpatrick had used unreasonable force; the MCSO's Internal Affairs investigation concluded that Kirkpatrick's "subject management techniques" were unreasonable; the County's Rule 30(b)(6) witness admitted that the force was "unreasonable and unnecessary"; and Kirkpatrick himself admitted that all four punches were unreasonable and excessive.

70. Despite all of that—a video-recorded, admittedly unjustified beating of a restrained, disabled man that fractured his face—Sheriff Baxter imposed only a 20-day suspension (which was served using banked vacation time) and additional training. Kirkpatrick remained an MCSO deputy. On July 2, 2025, the United States District Court for the Western District of New York granted Mr. Dzionara-Norsen partial summary judgment against Kirkpatrick on his excessive force and assault and battery claims, holding that no reasonable juror could find the force lawful. *Dzionara-Norsen v. County of Monroe*, No. 21-CV-6715, 2025 WL 1826383 (W.D.N.Y. July 2, 2025).

71. The *Hinchman* incident: On June 25, 2022, as Nicholas Hinchman walked through the Meadow Farm South apartment complex in North Chili, near his home, MCSO Deputies Nicholas

13

Priolo, Scott Jolly, and Andrew Charvat punched him multiple times in the head and face, threw him to the ground, used knee strikes to his ribs, and knelt on his back and neck.

72. Mr. Hinchman was transported to Strong Memorial Hospital, where he was diagnosed with serious injuries, including multiple broken ribs and a collapsed lung, and admitted as an inpatient for approximately three days. He was falsely charged with resisting arrest; all charges against him were dismissed on January 23, 2023. His civil rights action arising from the beating, *Hinchman v. Jolly*, No. 23-cv-6514 (W.D.N.Y.), in which Baxter is also a defendant, remains pending.

73. The MCSO opened Internal Affairs Investigation No. 22044 concerning the Hinchman incident. Upon information and belief, no MCSO member was disciplined in any way in connection with the Hinchman beating.

74. The *Megens-Sedor* incident: On April 27, 2023—ten months after the Hinchman beating, for which, he was never disciplined—Deputy Nicholas Priolo conducted a traffic stop of Alexander Megens-Sedor on Chili Avenue. After taking Mr. Megens-Sedor to the ground, Priolo, without any warning, released his K-9 partner, "Ranger," and ordered the dog to attack the subdued Mr. Megens-Sedor. Ranger bit off most of Mr. Megens-Sedor's right ear, then bit and gnawed his right side and hip for approximately three minutes while Priolo repeatedly ordered the dog to keep biting—commanding "fass," German for "attack"—and while Priolo struck Mr. Megens-Sedor in the head and ribs. The dog held its bite until after Mr. Megens-Sedor was handcuffed, when Priolo finally pried the dog off with a "breaker bar."

75. Mr. Megens-Sedor was treated in the trauma unit at Strong Memorial Hospital and admitted for approximately one week; he required multiple surgeries and a home health aide for approximately four months after his discharge. His civil rights action, *Megens-Sedor v. Priolo*, No.

24-CV-474 (W.D.N.Y.), in which Baxter is also a defendant, remains pending. Neither the County, nor the MCSO, nor Baxter imposed any discipline on Priolo for the attack.

76. These incidents—Hinchman (2022), Simon (2022), Kuriatnyk (2023), Megens-Sedor (2023), and Dzionara-Norsen (2020)—together with the County's and Baxter's responses to them, establish a persistent and widespread custom and practice: MCSO deputies who use grossly excessive force face either no discipline at all (Hinchman; Kuriatnyk; Megens-Sedor; the Simon credibility finding) or discipline so disproportionately lenient as to be meaningless (the 20-day suspension in Dzionara-Norsen).

77. The County's and Baxter's persistent failure to investigate, discipline, supervise, and retrain deputies who use excessive force created an environment in which MCSO deputies— including Piper and Boudrez—reasonably understood that they could brutalize civilians with impunity.

78. That custom and practice, and the deliberate indifference it reflects, was a moving force behind, and a proximate cause of, the unjustified and excessive beating and pepper-spraying of Mr. Afari.

79. The pattern continued after Mr. Afari's beating: Sergeant Edwards personally observed Mr. Afari's injuries and Piper's continued aggression at the scene, yet, upon information and belief, Edwards took no steps to report Piper's misconduct, to refer it for investigation, or to ensure that any discipline was imposed.

80. Upon information and belief, to date, neither the County, nor the MCSO, nor Baxter has disciplined Piper or Boudrez in any way for the beating and pepper-spraying of Mr. Afari— thereby ratifying their conduct.

## V.    CLAIMS FOR RELIEF

### FEDERAL CLAIMS
### FIRST CLAIM FOR RELIEF

**Excessive Force**
*Pursuant to 42 U.S.C. § 1983*
**(Against PIPER, BOUDREZ, and RICHARD ROE DEPUTIES 1-10)**

81.    All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

82.    Defendants' actions toward Plaintiff constituted excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

83.    Defendants used force against Mr. Afari that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them: Mr. Afari was suspected of traffic offenses and misdemeanors; he was unarmed; he was outnumbered; once on the ground he neither resisted nor attempted to flee; and he was fully restrained for much of the encounter.

84.    It was objectively unreasonable for Piper to punch Mr. Afari's helmeted head; to rip off Mr. Afari's helmet in order to punch his unprotected face; to repeatedly punch Mr. Afari in the face while he was pinned to the ground and restrained by two deputies; and to discharge pepper spray directly into Mr. Afari's face after the beating, while Mr. Afari remained restrained, bleeding, and non-resisting.

85.    It was objectively unreasonable for Boudrez to forcibly restrain Mr. Afari, and to continue restraining him, so that Piper could repeatedly punch him in the face and pepper-spray him, and to participate in ripping off Mr. Afari's helmet so that those punches would land on his unprotected face.

16

86.   The types and levels of force Defendants used against Plaintiff were in contravention of, and inconsistent with, MCSO policies and training.

87.   As a direct and proximate result of Defendants' conduct, Plaintiff sustained the serious physical, emotional, and economic injuries described above.

88.   Defendants' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed against them.

**SECOND CLAIM FOR RELIEF**
**Failure to Intervene**
*Pursuant to 42 U.S.C. § 1983*
**(Against BOUDREZ and RICHARD ROE DEPUTIES 1-10)**

89.   All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

90.   Each individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other members of the MCSO.

91.   Boudrez was physically present and personally participated in restraining Mr. Afari while Piper punched him in the face repeatedly and pepper-sprayed him. Boudrez had a realistic opportunity to intervene to stop Piper's use of grossly excessive force and failed to do so.

92.   The Roe deputies who were present at the scene observed Piper's use of force and his continued aggression toward the restrained Mr. Afari, had realistic opportunities to intervene, and failed to do so.

93.   Sergeant Edwards, the on-scene supervisor, personally observed Piper's continued aggression toward the restrained and injured Mr. Afari—including Piper's threat to pepper-spray him a second time—and failed to intervene to stop Piper's continued mistreatment of Mr. Afari, beyond directing him to step away, and failed to take any corrective or protective action.

17

94. The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed, by their affirmative conduct, to the circumstances in which Plaintiff's rights were violated.

95. As a direct and proximate result of Defendants' failures to intervene, Plaintiff's constitutional rights were violated, and he sustained the injuries described above.

96. Defendants' actions and omissions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed against them.

**THIRD CLAIM FOR RELIEF**
**Supervisory Liability — Failure to Supervise and Discipline**
***Pursuant to 42 U.S.C. § 1983***
**(Against BAXTER)**

97. All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

98. BAXTER personally caused Plaintiff's injuries through his own deliberate and conscious indifference to the rights of others, by failing to supervise and discipline Piper despite actual knowledge of Piper's propensity to use excessive force and to give false accounts of his uses of force.

99. Specifically, before July 16, 2025, BAXTER knew of: the June 22, 2022 judicial finding in *People v. Simon* that Piper's sworn testimony was not credible, and the resulting Giglio disclosures; and the March 13, 2023 assault on Steven Kuriatnyk, which was the subject of a lawsuit in which BAXTER was personally served as a defendant in March 2024.

100. Despite that knowledge, BAXTER imposed no discipline, retraining, restriction, or heightened supervision on Piper, and instead kept him on full, unrestricted patrol duty, where BAXTER knew Piper would continue to encounter—and, predictably, brutalize—members of the public.

101.    BAXTER's failure to supervise and discipline Piper, and his maintenance of a disciplinary system in which grossly excessive force carries no meaningful consequence, as described above, was a direct and proximate cause of Piper's assault on Mr. Afari.

102.    BAXTER's acts and omissions were undertaken with deliberate indifference to Plaintiff's constitutional rights, were a direct and proximate cause of Plaintiff's injuries, and were of such a nature that punitive damages should be imposed against them.

**FOURTH CLAIM FOR RELIEF**
**Municipal Liability**
*Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)*
**(Against the COUNTY OF MONROE)**

103.    All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

104.    At all relevant times, the COUNTY, acting through the MCSO and through Sheriff BAXTER—its final policymaker with respect to the supervision and discipline of MCSO members—maintained de facto policies, customs, and practices of: (a) failing to investigate and discipline MCSO members who use excessive force; (b) imposing discipline so grossly inadequate as to communicate tolerance of excessive force; (c) failing to supervise, monitor, and retrain members with known histories of excessive force and dishonesty; and (d) tolerating, accepting, and ratifying the use of grossly excessive force by its deputies.

105.    The customs, policies, and practices alleged herein are evidenced by, *inter alia*: (a) the absence of any discipline for the deputies who beat Nicholas Hinchman into a three-day hospitalization in June 2022; (b) the absence of any discipline for Piper after a county court judge found his sworn testimony incredible in June 2022; (c) the absence of any discipline for Piper after he assaulted Steven Kuriatnyk in March 2023, inflicting injuries requiring surgery and amputation;

(d) the absence of any discipline for Deputy Priolo after he ordered his K-9 to maul the subdued Alexander Megens-Sedor for three minutes in April 2023, biting off most of his ear, while Priolo punched and kicked him; and (e) the grossly inadequate 20-day suspension Baxter imposed on Deputy Kirkpatrick for the video-recorded, admittedly unjustified beating of a restrained, disabled inmate that fractured his face—force that a federal court has since held unlawful as a matter of law. *See Dzionara-Norsen v. County of Monroe*, No. 21-CV-6715, 2025 WL 1826383 (W.D.N.Y. July 2, 2025).

106.    Through these customs, policies, and practices, the COUNTY acted with deliberate indifference to the constitutional rights of persons who come into contact with MCSO deputies, including Plaintiff.

107.    The COUNTY's customs, policies, and practices were a moving force behind, and a direct and proximate cause of, the violations of Plaintiff's constitutional rights and the injuries described herein.

108.    In addition, BAXTER—the COUNTY's final policymaker—upon information and belief, ratified the individual defendants' misconduct by failing to investigate or discipline Piper or Boudrez for the beating and pepper-spraying of Mr. Afari.

109.    By reason of the foregoing, the COUNTY is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for compensatory damages.

## STATE LAW CLAIMS

### FIFTH CLAIM FOR RELIEF
**Assault**
*Pursuant to New York State Law*
**(Against PIPER and BOUDREZ)**

110.    All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

20

111.    Piper and Boudrez intentionally placed Mr. Afari in apprehension of imminent harmful and offensive contact, including when Piper ran at him and tackled him from his motorcycle; when Piper cocked back and threw punches at his head and face; when his helmet was ripped off so that further punches would land on his bare face; when Piper aimed and discharged pepper spray at his face; and when Piper threatened to pepper-spray him a second time as he sat handcuffed, injured, and blinded in the patrol car.

112.    At no time did Mr. Afari threaten the deputies or any other person, and at no time was the deputies' conduct privileged or justified. Any privilege the deputies possessed to use reasonable force to effect an arrest was grossly exceeded.

113.    Defendants committed the foregoing acts intentionally, willfully, and maliciously, and with reckless disregard for Plaintiff's rights.

114.    At all relevant times, Piper and Boudrez were acting within the scope of their employment as MCSO deputies, under the supervision and command of Defendant BAXTER, who, as their employer, is responsible for their conduct under the doctrine of respondeat superior.

115.    As a direct and proximate result of Defendants' conduct, Plaintiff sustained the damages described herein, in an amount to be determined at trial, and Defendants' conduct was of such a nature that punitive damages should be imposed against the individual defendants.

**SIXTH CLAIM FOR RELIEF**
**Battery**
*Pursuant to New York State Law*
**(Against PIPER and BOUDREZ)**

116.    All preceding and subsequent paragraphs are incorporated by reference as though fully set forth herein.

117.    Piper and Boudrez intentionally subjected Mr. Afari to harmful and offensive bodily contact without his consent, including by tackling him from his motorcycle; punching his

21

helmeted head; ripping his helmet off; repeatedly punching his unprotected face while he was pinned to the ground; pressing a knee into his neck; discharging pepper spray into his face while he was restrained; and forcibly dragging him to the patrol car.

118.    The deputies' contact with Mr. Afari was not privileged or justified, and grossly exceeded any force that could lawfully be used to effect his arrest. Mr. Afari was not resisting, posed no threat, and was restrained throughout the beating.

119.    Defendants committed the foregoing acts intentionally, willfully, and maliciously, and with reckless disregard for Plaintiff's rights.

120.    At all relevant times, Piper and Boudrez were acting within the scope of their employment as MCSO deputies, under the supervision and command of Defendant BAXTER, who, as their employer, is responsible for their conduct under the doctrine of respondeat superior.

121.    As a direct and proximate result of Defendants' conduct, Plaintiff sustained serious physical, emotional, and economic injuries, in an amount to be determined at trial, and Defendants' conduct was of such a nature that punitive damages should be imposed against the individual defendants.

WHEREFORE, Plaintiff respectfully requests that the Court assume jurisdiction over this action and:

a.    Empanel a jury to hear and decide all issues so triable;

b.    Award Plaintiff compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

c.    Award Plaintiff punitive damages against the individual Defendants in an amount to be determined at trial (no punitive damages are sought against the County);

d.      Award Plaintiff the costs of this action and reasonable attorney's fees pursuant to

42 U.S.C. § 1988;

e.      Award pre-judgment and post-judgment interest as permitted by law; and

f.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all issues so triable.

Dated:    New York, New York
          July 6, 2026

                                          Respectfully submitted,

                                          ROTH & ROTH, LLP

                                          *Elliot Shields*
                                          _____
                                          Elliot Dolby Shields, Esq.
                                          *Attorneys for Plaintiff*
                                          192 Lexington Avenue, Suite 802
                                          New York, New York 10016
                                          (212) 425-1020
                                          eshields@rothandrothlaw.com

TO:    CHRISTOPHER PIPER, AARON BOUDREZ, and TODD BAXTER
       Monroe County Sheriff's Office
       130 South Plymouth Avenue
       Rochester, NY 14614

       COUNTY OF MONROE
       c/o Monroe County Department of Law
       307 County Office Building,
       39 West Main Street
       Rochester, NY 14614

23